# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ ) | | |
| **BREATHE DC,** ) | | |
| ) | | |
| **Plaintiff,** ) | | |
| ) | | |
| **v.** ) | **Civil Action No. 16-2378 (ESH)** | |
| ) | | |
| **SANTA FE NATURAL TOBACCO** ) | | |
| **COMPANY,** *et al.* ) | | |
| ) | | |
| **Defendants.** ) | | |
| _____ ) | | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Breathe DC filed this lawsuit on behalf of the "general public" in D.C. Superior Court against defendants Santa Fe Natural Tobacco Company ("Santa Fe"), R.J. Reynolds Tobacco Company ("RJRT"), and Reynolds American Inc. ("RAI"), alleging violations of the D.C. Consumer Protection Procedures Act ("DCCPPA"), D.C. Code § 28-3901, *et seq.* (Compl. [ECF No. 1-1].) Defendants removed the case to federal court pursuant to 28 U.S.C. § 1441, claiming diversity jurisdiction under 28 U.S.C. § 1332. (Notice of Removal ("Notice"), December 6, 2016 [ECF No. 1].) Plaintiff filed the present motion for remand on the grounds that this Court lacks subject-matter jurisdiction. (Pl.'s Mot. to Remand for Lack of Subject-Matter Jurisdiction ("Mot."), December 7, 2016 [ECF No. 5].) Plaintiff also seeks attorneys' fees and costs incurred in preparing the motion. (*Id.* at 9.)

Upon consideration of the pleadings[1] and for the reasons stated below, the case will be remanded to state court, but the Court will not award attorneys' fees.  Accordingly, the motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff is a non-profit organization based in Washington, D.C. whose mission is to "safeguard the lung health of Washington, D.C.-area residents."  (Compl. ¶¶ 1, 28, 37.) Defendants manufacture, market, and distribute Natural American Spirit ("NAS") brand cigarettes in Washington, D.C.[2]  (Compl. ¶ 32.)  Plaintiff, acting as a private attorney general, alleges that the defendants falsely implied that NAS cigarettes are safer than other cigarettes by marketing them as "Natural," "Additive-Free," and "100% Additive-Free," in violation of the DCCPPA.  (Compl. ¶¶ 2–5.)  Based on those allegations, plaintiff seeks a declaration that defendants are in violation of DCCPPA, an injunction, and attorneys' fees and costs with prejudgment interest.  (*See id.* at 26–27.)  Plaintiff's proposed injunction would (1) "enjoin[] Defendants' deceptive marketing and sale of the Products," (2) "direct[] Defendants to remove [the allegedly deceptive] language and graphics on their marketing and labeling," and (3) direct defendants "to engage in a corrective advertising campaign."  (*Id.*)

---

[1] Before the Court are defendant's notice of removal, plaintiff's motion to remand, defendants' opposition (Defs.' Mem. of Law in Opp'n to Pl.'s Mot. to Remand ("Opp'n"), January 11, 2017 [ECF No. 18]), and plaintiff's reply, (Pl.'s Reply, January 18, 2017 [ECF No. 19]).

[2] RAI is a holding company that does not itself manufacture or sell cigarettes.  (Notice at 1).  However, RAI's wholly owned subsidiaries, Santa Fe and RJRT, do manufacture and sell cigarettes.  (Compl. ¶ 1).  None of the three defendants is a citizen of Washington, D.C.  RAI and RJRT are incorporated in North Carolina and have their principal places of business in North Carolina, while Santa Fe is incorporated in New Mexico and has its principal place of business in New Mexico.  (*Id.* ¶ 29–30; Notice at 3-4.)

On December 6, 2016, defendants removed the case to federal court.  (*See* Notice at 1.)
In their Notice of Removal, defendants invoke diversity jurisdiction under 28 U.S.C. § 1332 as
the sole basis of federal jurisdiction.  (*See id.* at 2.)  Plaintiff filed this Motion to Remand for
Lack of Subject-Matter Jurisdiction. (Mot. at 1.)

With their opposition to plaintiff's motion, defendants' submitted the sworn declaration
of David P. DePalma, Senior Director of Marketing for Santa Fe Natural Tobacco Company.
(Decl. of David P. DePalma, January 11, 2017 [ECF No. 18-1].)  In his capacity as Senior
Director of Marketing, Mr. DePalma oversees "strategic planning and execution of NAS
packaging, mass market NAS print advertising, the NAS brand website . . . , direct marketing
communications . . ., and retail point-of-sale NAS marketing communications."  (*Id.* ¶ 2.)  Mr.
DePalma's declaration "describes the impact that would result from implementation of the
injunctive relief requested in the Complaint."  (*Id.* ¶ 3.)

"[B]ased on both [his] historical experience with the development of packing and
marketing communications and the activities and costs associated with those activities," Mr.
DePalma estimates that the cost of complying with plaintiff's proposed injunction "would exceed
$900,000 . . . before accounting for the irreparable damage to the NAS brand that the requested
relief would impose." (Decl. of DePalma ¶ 15.)[3]  That estimate involves two cost components.
First, Mr. DePalma estimates that removing the allegedly deceptive terms from its packaging and
advertising would cost "at least $700,000,"[4] not including lost employee time.  (*Id.* ¶ 15.)

---

[3]  DePalma notes that "[t]the NAS brand is [Santa Fe's] primary asset and thus the
fundamental basis for the value of the company."  (Decl. of DePalma ¶ 5.)

[4]  DePalma further breaks down the $700,000 figure: $550,000 for the "cost of new
cylinders [used for brand packaging], engraving [the cylinders], and art development" and
$150,000 to "develop and test new creative material for advertising."  (Decl. of DePalma ¶ 15.)

Second, Mr. DePalma estimates that the "corrective advertising campaign" that plaintiff seeks "would readily exceed $200,000 (including cost of developing and testing communication messages, creative, and accompanying media buying costs)."  (*Id.* ¶ 16.)  DePalma estimates the value of the NAS domestic trademark is over $5 billion.  (*Id.* ¶ 6.)[5]

## ANALYSIS

## I.   LEGAL STANDARD

A defendant may remove a civil action filed in state court to a United States district court as long as the lawsuit could have originally been filed in federal court.  *See* 28 U.S.C. § 1441(a).  Removal is effective when the defendant files a notice of removal in federal court with "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders" from state court.  *Id.* § 1446(a).  However, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  *Id.* § 1447(c).  A party may challenge the federal court's subject matter jurisdiction on a motion to remand to state court.  *Id.*

Upon a motion to remand to state court, the party opposing the motion "bears the burden of establishing that subject matter jurisdiction exists in federal court."  *RWN Dev. Grp., LLC v. Travelers Indem. Co.*, 540 F. Supp. 2d 83, 86 (D.D.C. 2008) (quoting *Int'l Union of Bricklayers & Allied Craftworkers v. Ins. Co. of the West,* 366 F. Supp. 2d 33, 36 (D.D.C. 2005)).  In order to avoid federalism concerns, courts are to construe the removal statute narrowly.  *Shamrock Oil &*

His estimate is based in part on a 2014 "much more limited redesign of [the] NAS brand packaging," which cost $290,000.  (*Id.*)

[5] Mr. DePalma cites the January 2016 sale of the international rights to the NAS trademark to a third party for $5 billion and reasons that the domestic trademark is even more valuable because the sales volume is lower in the international market.  (Decl. of DePalma ¶ 6.)

*Gas Corp. v. Sheets,* 313 U.S. 100, 108 (1941).  Thus, any doubts about the existence of subject matter jurisdiction are to be resolved in favor of remand.  *Hood v. F. Hoffman–La Roche, Ltd.,* 639 F. Supp. 2d 25, 28 (D.D.C. 2009) (citing *Gasch v. Hartford Accident & Indem. Co.,* 491 F.3d 278, 281-82 (5th Cir. 2007)).

## II.   DIVERSITY JURISDICTION

A federal court has diversity jurisdiction when (1) there is complete diversity of citizenship among the parties (that is, no plaintiff is a citizen of the same state as any defendant), and (2) the "amount in controversy" is greater than $75,000.  *See* 28 U.S.C. § 1332(a).  Based on the representations of the parties, the Court is satisfied that there is complete diversity of citizenship.  Plaintiff is a citizen of Washington, D.C.  (Compl. ¶ 28.)  Defendants are citizens of North Carolina and New Mexico.  (Compl. ¶ 29–30; Notice at 3-4.)  The issue in this case is whether defendant has established that the amount in controversy exceeds $75,000.

Where, as here, the party seeking remand contests the removing party's amount-in-controversy allegation, removal is proper "if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 553–54 (internal quotation marks omitted) (quoting 28 U.S.C. § 1446(c)(2)(B)).  When calculating the amount in controversy under 28 U.S.C. § 1332, it is well-established that "the separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement." *Snyder v. Harris,* 394 U.S. 332, 335 (1969); *Georgiades v. Martin–Trigona,* 729 F.2d 831, 833 (D.C. Cir. 1984) ("Separate and distinct claims, regardless of whether they share a community of interest or originate in a single transaction or event, may not be aggregated to satisfy the

jurisdictional amount-in-controversy requirement."). The so-called "non-aggregation principle [is] derived from the statutory phrase matter in controversy. Hence, the doctrine still applies when separate and distinct claims are asserted on behalf of a number of individuals, regardless of whether an action involves a simple joinder of multiple plaintiffs, [or is] a representative action." *Breakman v. AOL LLC*, 545 F. Supp. 2d 96, 103-04 (D.D.C. 2008) (citations and quotation marks omitted).

Defendants argue that remand should not be granted because the amount in controversy is satisfied by the cost that defendants would incur by complying with plaintiff's proposed injunction. (Opp'n at 7–10.) Plaintiff responds that the cost of compliance is not an appropriate measure of the amount in controversy, and even if it were, that the total cost would have to be divided among all beneficiaries of the injunction so as not to run afoul of the non-aggregation principle. (*See* Pl.'s Reply at 11.)

As explained below, defendants have not proven by a preponderance of the evidence that this suit meets the amount in controversy based on the cost of compliance with the proposed injunction. While the D.C. Circuit has yet to address the question of how to calculate the amount in controversy for purposes of determining diversity in private attorney general actions, this Court is guided by the principle that the removal statute should be construed narrowly in favor of remand and that separate and distinct claims should not be aggregated. On these bases, the Court concludes that, even though the cost of compliance with the proposed injunction may be considered, the total cost must be divided among the beneficiaries of that injunction for purposes of calculating the amount in controversy.

### A.  Measuring the Value of Injunctive Relief

The parties disagree on how the value of injunctive relief should be determined for purposes of satisfying the amount in controversy.  Defendants contend that "the court can measure the amount in controversy by looking to the defendant's cost in complying with the requested injunction."  (Notice at 4.)  Plaintiff argues that the "cost-to-defendant test is no longer used in this Circuit . . . . and it certainly cannot be applied in . . . a [DC]CPPA action for injunctive relief.  (Mot. at 4.)

The circuits are split on this issue.  "The majority of federal courts have chosen to use the plaintiff viewpoint rule."  15 *Moore's Federal Practice* § 102.109 (Matthew Bender 3d ed.) (citing cases from the Second, Third, Eighth, and Eleventh Circuits).  Under this approach, "[t]he test of the jurisdictional amount is the value of the plaintiff's right that is to be protected, and not the extent of the monetary loss or damage that has been suffered or is threatened by the invasion."  *Id.*  Several other circuits adhere to the "either viewpoint" approach.  *Id.* (citing cases from the Seventh, Tenth, Fourth, and D.C. Circuits).  Courts that follow the plaintiff-viewpoint rule "may look either to the value of the right that the plaintiff seeks to enforce or to protect, or to the cost to the defendants to remedy the alleged denial of that right."  *Id.*

As noted, the D.C. Circuit appears to have adopted the "either-viewpoint" rule.  In *Tatum v. Laird*, 444 F.2d 947 (D.C. Cir. 1971), *rev'd on other grounds*, 408 U.S. 1 (1972), the Circuit noted the split of authorities and held that "the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce." *Id.* at 951 n.6 (quoting *Ronzio v. Denver & R. G. W. R. Co.*, 116 F.2d 604, 606 (10th Cir. 1940)).  The *Tatum* Court remanded because "the cost to the [defendant] of complying with [an injunction] might well exceed $10,000."  *Id.* at 951.  The Circuit has twice followed *Tatum*.  *See Smith v.*

*Washington*, 593 F.2d 1097, 1099 (D.C. Cir 1978) ("In assessing whether a complaint satisfies

that standard, a court may look either to the value of the right that plaintiff seeks to enforce or to

protect or to the cost to the defendants to remedy the alleged denial." (quotation marks and

footnote omitted)); *Comm. for GI Rights v. Callaway*, 518 F.2d 466, 472 (D.C. Cir 1975) ("[T]he

amount in controversy may be measured either by the 'value of the right sought to be gained by

the plaintiff or the cost of enforcing that right to the defendant.'" (quoting *Tatum*, 444 F.2d at

951)).  Although plaintiff argues that the cost-to-defendant test "is no longer used in this

Circuit," plaintiff does not identify any D.C. Circuit or Supreme Court precedent overruling

*Tatum* and its progeny.  (*See* Mot. at 4.)[6]  Indeed, the majority of recent district court cases in

this jurisdiction adhere to the either-viewpoint rule and at least consider the cost of a proposed

injunction to the defendant.[7]  This Court must follow Circuit precedent, and thus it will consider

the cost of the injunction to defendants.

Defendants, relying on the declaration of Mr. DePalma, argue that "the costs to

Defendants of complying with the injunction Plaintiff seeks in this action far exceed $75,000."

(Opp'n at 11.)  The three major costs that defendants argue that the injunction would impose on

---

[6] As plaintiff correctly points out, the D.C. Circuit did question the *Tatum* rule in *Fenster v. Schneider*, 636 F.2d 765, 767 n.1 (D.C. Cir. 1980), noting that the Ninth Circuit had recently held that the "cost-to-defendant rule" "was an impermissible way of circumventing" the Supreme Court's non-aggregation cases – *Snyder v. Harris*, 394 U.S. 332 (1969), and *Zahn v. International Paper Co.*, 414 U.S. 291 (1973).  However, the *Fenster* court held that it did not need to "resolve any possible conflict . . . at this time," since the plaintiff had jurisdiction under a different statute.  636 F.2d at 767 n.1.

[7] *See, e.g.*, *Witte v. Gen. Nutrition Corp.*, 104 F. Supp. 3d 1, 6 (D.D.C. 2015); *Nat'l Consumers League v. Bimbo Bakeries USA*, 46 F. Supp. 3d 64, 74 (D.D.C. 2014); *Geo Specialty Chems., Inc. v. Husisian*, 951 F. Supp. 2d 32, 39-40 (D.D.C. 2013); *Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 729 F. Supp. 2d 304, 332 (D.D.C. 2010); *Wexler v. United Air Lines*, 496 F. Supp. 2d 150, 153 (D.D.C. 2007).

them are the following: (1) the loss of value of the NAS brand, (2) the costs of redesigning NAS

brand packaging and advertising, and (3) the cost of the "corrective advertising campaign." (*Id.*

at 11–12.)  While the costs of the NAS redesign and "corrective advertising campaign" would

flow directly from the proposed injunction, the loss of value of the NAS brand is not properly

considered as part of the cost to defendants of the injunction.  And even if it were, defendants do

not present any non-speculative evidence of what the expected loss of value to the brand would

be.

Invoking the value of the brand is essentially an argument that defendants' future revenue

would suffer.[8]  One district court in this Circuit has considered whether lost future earnings can

be counted as part of the cost to the defendant of the proposed injunction.  In *Zuckman v.*

*Monster Beverage Corp.*, 958 F. Supp. 2d 293 (D.D.C. 2013), Judge Bates considered a motion

to remand a DCCPPA action brought by an individual on behalf of the general public seeking,

*inter alia*, injunctive relief.  Judge Bates ordered that the case be remanded to state court despite

Monster's claims that it would suffer a decrease in revenue of more than $75,000 in complying

with the proposed injunction.  Judge Bates noted that courts have held that it is "improper to

consider a decrease in future revenue as a cost of complying with the injunction" and found that,

even if it were proper, Monster's claims of lost revenue were too speculative.  *Id.* at 302 (citing

*Snow v. Ford Moto Co.*, 561 F.2d 787, 790 (9th Cir. 1977)).

This Court is persuaded by *Zuckman*.  Even if the brand's name includes one of the

words that plaintiff seeks to enjoin, it does not follow that the brand's value should be considered

---

[8] DePalma ties his estimate of the value of the brand to its sales.  (*See* Decl. of DePalma
¶ 6 (stating that the value of the domestic trademark would be higher than the international
trademark because domestic sales are higher).)

in determining the amount in controversy.  Any loss of brand value would be an incidental effect of ceasing defendants' allegedly illegal conduct, not a direct result of the Court's order.  Even if a diminution in brand value were properly considered as a cost of compliance, the Court could not determine that loss given the evidence that defendants present.  Mr. DePalma recites his estimate of the brands *current value*, but he makes no attempt to quantify the *loss of value the brand would suffer* in complying with the injunction.  As in *Zuckman*, defendants in this case have offered no evidence of how the proposed injunction "would affect sales, how consumers and competitors would respond, [or] how it would alter the price of its product."  *See* 958 F. Supp. 2d at 303.

By contrast, the costs of the redesign and the cost of the "corrective marketing campaign" would flow directly from the injunction that plaintiff seeks.  Although DePalma's estimates could be more precise, the costs need not be proven to a legal certainty.  *See Dart*, 135 S. Ct. at 554.  DePalma's estimates are based on his experience and relevant expenditures of the businesses in the past.  Thus, the Court will consider the estimated $700,000 in redesign costs and $200,000 in "corrective marketing campaign" costs, for a total of $900,000, as the costs of compliance with the proposed injunction.

While the *total cost* to defendants of the proposed injunction exceeds $75,000, the Court's inquiry does not end here.  The Court must determine whether the total cost of compliance must be spread across the intended beneficiaries of the injunction in order to determine the amount in controversy.

### B.  The Non-Aggregation Principle

Plaintiff argues that, even if this Court were to consider the cost of the injunction to defendants, the relevant amount in controversy is not defendants' total costs but rather that total

cost "divided by the number of consumers who benefit from the injunction." (Mot. at 7.)

Defendants respond that, because "this is a single-plaintiff action, not a class action or other

multi-claimant lawsuit," there is "no basis for the Court to 'disaggregate'" the costs of

compliance among the beneficiaries. (Opp'n at 12.) Plaintiff has the better argument.

The D.C. Circuit has not ruled on the proper method for calculating a defendant's

injunction costs in representative suits such as this one. One district court, however, did consider

the issue in the context of a DCCPPA suit, brought on behalf of "each individual District of

Columbia consumer," seeking both damages and injunctive relief related to AOL's pricing

policy. *Breakman*, 545 F. Supp. 2d at 100. AOL calculated that "its time and resources [for

complying with the injunction] would total $255,800" and estimated that plaintiff's "complaint

[would] reach 28,451 consumers in the District of Columbia." *Id.* at 100, 106. The court held

that "when a court looks to the compliance costs of a defendant to determine the amount in

controversy in an action where separate and [distinct] claims are presented on behalf of multiple

parties, 'the cost running to each plaintiff must meet the amount in controversy requirement.'"

*Id.* at 106 (quoting *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 898 (10th Cir. 2006)).

Since "the cost running to each District of Columbia consumer [was] $ 8.99," the Court

remanded the suit. *Id.*

This Court, faced with a putative class action arising under DCCPPA, was persuaded by

*Breakman* and determined that, "for defendants to carry their burden to establish the amount in

controversy, they must show that the costs of the injunction that run to each plaintiff individually

exceed the jurisdictional amount." *Witte*, 104 F. Supp. 3d at 6. The only distinction from that

case is that, in this case, plaintiff is a nonprofit organization bringing suit on behalf of the

"general public," rather than an individual acting on behalf of a putative class of consumers.

Mindful of the narrow construction it must give the removal statute, the Court is not persuaded that the way a lawsuit is framed–as a private attorney general action by a nonprofit versus as a putative class action by an individual–should determine whether federal jurisdiction lies.

Most importantly, defendants' argument that this Court should consider their total compliance costs in calculating the amount in controversy would circumvent the non-aggregation principle articulated in *Snyder* and *Zahn*.  In *Snyder* the Court held that "[t]he separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement" except "in cases in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest."  *Snyder*, 394 U.S. at 335; *see Zahn*, 414 U.S. at 294 ("When two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount." (quoting *Troy Bank v. G.A. Whitehead & Co.*, 222 U.S. 39, 40-41 (1911))).  Although the Court spoke in terms of "plaintiffs" in *Synder* and *Zahn*, the rationale extends equally to actions brought by nonprofit groups where the beneficiaries need not be added as parties to the lawsuit.

Defendants further contend that aggregation is proper as the "interest Plaintiff asserts is a 'common and undivided' one" that would require the same actions by defendants regardless of the number of claimants.  (Opp'n at 15.)  However, this is not a case where no member of the "general public" could enforce the right at issue in the absence of the others.  *See Nat'l Org. for Women v. Mut. of Omaha Ins. Co.*, 612 F. Supp. 100, 106 (D.D.C. 1985) (citation omitted) (plaintiffs share "common and undivided interest if individual members of the class could not as

a matter of law bring suit other than in a representative capacity"); *Troy Bank of Troy, Ind., v. G.A. Whitehead & Co.,* 222 U.S. 39, 41 (1911) ("[P]laintiffs have a common and undivided interest, [] which neither can enforce in the absence of the other.").  Indeed, defendants concede that a NAS "consumer" or individual who "purchased or received" NAS cigarettes could bring a DCCPPA suit.  (Opp'n at 16 (citing D.C. Code § 28-3905(k)(1)(A)–(B)).)  Accordingly, to determine the amount in controversy from the defendants' perspective, the cost of compliance must be divided among the beneficiaries of the injunction.

The Court must consider whether the total cost of compliance divided among the beneficiaries still meets the amount in controversy.  Defendants argue that the maximum number of beneficiaries of the injunction (that is, the appropriate denominator) would be 60% of the estimated 3,297 adult NAS smokers, based on plaintiff's allegation that 50-60% of consumers are misled by defendants' advertising.  (Opp'n at 25.)  However, in arguing the amount in controversy is still met, defendants improperly use the $5 billion estimated brand value as the total cost of the injunction (that is, the numerator).  The costs reasonably attributed to the injunction–$900,000– divided by the number of beneficiaries falls well below the $75,000 threshold.[9]  Thus, defendants have not shown that the amount in controversy is satisfied, and this Court cannot exercise jurisdiction in this matter.  *See Witte*, 104 F. Supp. 3d at 6.

## III.   FEES AND COSTS

Plaintiff seeks "just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  (Mot. at 9 (quoting 28 U.S.C. § 1447(c)).)  A court may award such fees if the removing party lacks "an objectively reasonable basis for seeking removal."  *Martin v.*

---

[9] Even using defendants' figure of 60% of the estimated 3,297 adult NAS smokers, the costs of compliance to the defendant would be $454.96 per beneficiary.

*Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005).  Given the lack of controlling precedent in this Circuit and the factual novelty presented by this case, and notwithstanding the thrust of the opinions of the district courts in this Circuit, defendants did not lack an "objectively reasonable basis for removal."  Therefore, the Court concludes that an award of attorneys' fees is not appropriate for this action.

## CONCLUSION

Accordingly, plaintiff's Motion for Remand to State Court and for Attorneys' Fees and Costs will be **GRANTED IN PART AND DENIED IN PART**.  The matter will be remanded to D.C. Superior Court, but the request for attorneys' fees is denied.  A separate Order [ECF No. 20] accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: February 8, 2017

14